# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANNETTE RENE MILLER, | CASE NO. 3:13-cv-02126-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF<br>SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 9, 10, 11, 12, 13 |

## I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Annette Rene Miller for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"). This was Plaintiff's fifth claim for disability insurance benefits. Although Plaintiff had a history of severe psychological symptoms and three inpatient hospitalizations in 1997, 1998, and 2001, she improved in October of 2007 when she was prescribed a medication regimen that worked for her. At that time, she was stable and her symptoms were well-controlled. Plaintiff filed her fourth social security disability claim on January 8, 2008. However, the next week she reported to her physician that her symptoms were well-controlled on medication. Plaintiff did not complain of symptoms until August 29, 2008, when she asked her physician to fill out disability forms. However, her physician would only fill out the forms for a period up until she was evaluated by a psychiatrist. Plaintiff refused to schedule an evaluation by a psychiatrist, and her treating physician noted in March of 2009

that "[s]he needs to see psychiatry for an evaluation. I will extend her temp disability one more time for her, but will not do again unless she gets an appt with them. She does not appear to me during this interview to have [symptoms] that would keep her from working." (Tr. 236). On June 22, 2009, Plaintiff's claim was denied.

Plaintiff was evaluated in December 2009 by a psychiatrist, and exhibited many symptoms. She improved, but did poorly on one of her medications. Her physician switched her medications on April 21, 2010, and by May 19, 2010, Plaintiff's mental status exam was normal, she reported that she "felt much better," and her physician opined that she "looked much better" and was "much calmer." However, she lost her job on May 22, 2010, and filed the present claim on May 27, 2010, alleging an onset date of May 22, 2010.

Subsequently, aside from a two-day period in October of 2010, Plaintiff consistently reported improved or stable mood and had largely normal mental status exams. Plaintiff was only seen six times, on average about once every two months, for ten to fifteen minutes, by a mental health professional. She never mentioned psychological symptoms in visits to her other providers during the relevant time. As a result, the ALJ concluded that Plaintiff's impairments had improved since the time when she required inpatient hospitalizations and exhibited severe symptoms. He concluded that she could perform her past relevant work as a hospital housekeeper because, *inter alia*, it was simple, low-stress, and did not require interacting with people. In doing so, the ALJ gave significant weight to the opinion of a state agency consultant and found Plaintiff to be only partially credible.

Plaintiff asserts that the ALJ erred in failing to credit her treating physicians' treatment notes, her history of hospitalizations, the state agency physician's opinion, and her claims and

testimony. However, her treating physician opined that she was able to work. The state physician's opinion stated that she had only moderate limitations, aside from marked limitations in complex tasks, which Plaintiff was not required to do as a hospital housekeeper. The ALJ properly used her history of hospitalizations only to conclude that Plaintiff had improved, because res judicata barred the ALJ from relitigating issues decided in the prior denial of benefits. The ALJ properly discounted Plaintiff's credibility because it was contradicted by her very conservative treatment and absence of symptoms during the relevant period. Plaintiff did not allege any other error by the ALJ.

The Court also notes that Plaintiff failed to identify what harm these alleged errors caused. She does not allege she should have been able to meet a listed impairment, and the only limitations she alleges should have been in the RFC-marked limitations in her ability to understand, remember, and carry out detailed instructions-were accommodated for by the ALJ's limitation to simple and routine tasks. For all of the foregoing reasons, the Court finds that substantial evidence supports the ALJ's decision.

## II.    Procedural Background

Plaintiff had previously filed four applications for DIB, which were denied on February 23, 2001, May 13, 2003, April 8, 2004, and June 22, 2009. (Tr. 173). On May 27, 2010 and June 17, 2010, Plaintiff filed an application for SSI under Title XVI of the Act and for DIB under Title II of the Act. (Tr. 145-57). On August 12, 2010, the Bureau of Disability Determination denied these applications (Tr. 90-92), and Plaintiff filed a request for a hearing on September 15, 2010.  (Tr. 116-17). On August 31, 2011, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 30-72).

On September 15, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11-29). On November 14, 2011, Plaintiff filed a request for review with the Appeals Council (Tr. 6-10), which the Appeals Council denied on June 11, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On August 9, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 20, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On January 4, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief"). (Doc. 11). On February 6, 2014, Defendant filed a brief in response ("Def. Brief"). (Doc. 12, 13). On April 30, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned on July 3, 2014, and an order referring the case to the undersigned for adjudication was entered on July 7, 2014. (Doc. 16, 17).

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the

Commissioner's determination is supported by substantial evidence. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999); <u>Johnson</u>, 529 F.3d at 200.

### IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>see also</u> <u>Plummer</u>, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. <u>See</u> 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the

claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## V. Relevant Facts in the Record

Plaintiff was born on August 21, 1968 and was classified by the regulations as a younger individual through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 90).   She has at least a high school education and past relevant work as a hospital housekeeper.  (Tr. 36, 64).

Plaintiff was hospitalized in 1997 for five days for alcohol dependence. (Tr. 298-300). She was drinking "1 to 1 ½ cases of beer a day" and had self-injurious behavior. (Tr. 298-300). She was hospitalized in 1998 after she spent eight hours drinking at bar and woke up "want[ing] to die." (Tr. 305). She was hospitalized in 2001 when she started to self-injure herself again. (Tr. 310). She had a global assessment of functioning ("GAF") score of only 30.[1] (Tr. 313). She was

---

[1] Schwartz v. Colvin, 3:12-CV-01070, 2014 WL 257846 at *5 n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of

hospitalized in 2003 when she felt that she didn't want to live anymore and overdosed on trazodone. (Tr. 323).

Plaintiff was treated with Lexapro, and did well through 2004 and 2005. (Tr. 365, 367). Plaintiff had been able to work and earn wages in one quarter in 2003 and all four quarters in 2004, 2005, and 2006. (Tr. 167). However, on March 2, 2006, she had worsening anxiety and suicide ideation the previous day. (Tr. 363). On February 5, 2007 she had "some suicide ideation" and "feels like cutting herself but hasn't." (Tr. 353). On May 22, 2007 she "continue[d] to have symptoms of bipolar disorder including rapid fluctuations in mood." (Tr. 343). However, by October 9, 2007 her symptoms were "well-maintained on current medications" and she was "currently without complaints." (Tr. 339). Plaintiff worked and earned wages during three quarters in 2007, and did not work in 2008. (Tr. 167).

---

examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 1 to 10 denotes a persistent danger of severely hurting oneself or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death. *Id.* A GAF score of 11 to 20 represents some danger of hurting self or others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication. *Id.* A GAF score of 21–30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.*").

On January 15, 2008, and April 15, 2008, she saw Dr. Vikas Passi, M.D., for a follow-up of depression, when she stated it had been well-controlled. (Tr. 223, 394). On April 30, 2008, Dr. Passi noted that her bipolar medications are working well. (Tr. 225). She made no mention of mental impairments on July 29, 2008 with Dr. Passi. (Tr. 227). On August 29, 2008, Plaintiff saw Dr. Passi to fill out disability forms. (Tr. 229). He agreed to a temporary disability period "pending evaluation by a psychiatrist." (Tr. 230). On October 22, 2008, notes indicate that Plaintiff was "waiting to see psychiatry for a disability eval, although she says that her [symptoms] are well controlled with her medications." (Tr. 231). On March 24, 2009, Plaintiff had not gone to her psychiatry evaluation and "never bothered calling to get a new referral." (Tr. 235). Dr. Passi noted "She needs to see psychiatry for an evaluation. I will extend her temp disability one more time for her, but will not do again unless she gets an appt with them. She does not appear to me during this interview to have [symptoms] that would keep her from working." (Tr. 236).

Plaintiff's most recent prior claim was denied on June 22, 2009, and her alleged onset for the current claim is May 22, 2010. Plaintiff worked and earned wages for three quarters in 2009 and one quarter in 2010. In between June 22, 2009 and September 16, 2011, the date of the present ALJ decision, she received mental health treatment only from Dr. Andrew Newton, M.D. about every two months. She had a total of nine visits with him and only six visits during the relevant period. (Tr. 217-21, 440-44). She was evaluated on December 31, 2009. (Tr. 220). She displayed "prominent psychomotor restlessness and agitation" and "avoided eye contact." (Tr. 220). She was depressed, anxious, irritable and severely agitated. (Tr. 220). She expressed paranoid ideas, her anxiety and concentration were significantly impaired, she was not oriented

to time, and her insight and judgment were poor. (Tr. 220). However, Dr. Newton noted that she had "a long history of noncompliance with psychotropic medications." (Tr. 221). He assessed her with a GAF of 50, adjusted her medication and scheduled her for individual one-on-one therapy and to follow-up with him in two months. (Tr. 221).

However, the record does not indicate that Plaintiff participated in any one-on-one therapy. (Tr. 221). The next record of mental health treatment is from a follow-up with Dr. Newton on March 9, 2010. (Tr. 219). At this visit, she reported that she was "doing fairly well" and was assessed a GAF of 55. (Tr. 219). Dr. Newton noted that "[s]leep, appetite and concentration have shown considerable improvements" and she felt like she was "able to cope better," although she continued to "have episodes when she would clench her teeth and has difficulty relaxing." (Tr. 219). Her speech was soft, her mood was dysthymic, and her cognition, insight, and judgment were impaired, but her mental status exam was otherwise normal. (Tr. 219). On April 21, 2010, Plaintiff was "doing a little better" but remained "very agitated and unable to stand the crowd." (Tr. 218). Dr. Newton noted that her medication, Geodon, was causing her to do poorly. (Tr. 218). She indicated that she sleeps poorly, cries easily, continued to have suicidal ideations, and was about to be fired from her job at a local retail store. (Tr. 218). Dr. Newton assessed her with a GAF of 45, adjusted her medication, and again recommended she schedule one-on-one counseling. (Tr. 218).

Plaintiff testified that she lost her job because on May 22, 2010, when she filed for disability, because of her depression and mania after her medication changed. (Tr. 38). However, on May 19, 2010, she had reported that "felt much better" after Dr. Newton adjusted her medication and Dr. Newton noted that she "looked much better." (Tr. 38, 217). She was "less

agitated" and "much calmer." (Tr. 217). Her insight and judgment were fair, and her mental status exam was otherwise entirely normal. (Tr. 217). Dr. Newton continued her on her medication regiment and again recommended she schedule one-on-one counseling. (Tr. 217). On July 28, 2010, she was doing a "little better," her "sleep, appetite and concentration [were] within normal limits except for poor sleep" and she "described improved mood." (Tr. 444). Her insight and judgment were fair, and her mental status exam was otherwise entirely normal. (Tr. 444). Dr. Newton assessed her with a GAF of 50. (Tr. 444). Her appearance was within normal limits and she was not disheveled. (Tr. 444).

On June 30, 2010, Plaintiff completed a Function Report. (Tr. 196). She reported that she cares for her son with the help of her mother, mother-in-law, neighbor, and husband. (Tr. 197). She indicated problems with her personal care, such as sometimes not changing clothes, bathing, shaving, and sometimes had problems feeding herself. (Tr. 197). She reported that her husband had to help remind her to care for herself. (Tr. 198). She reported that she could cook complete meals on a daily basis and that she could clean, do laundry, and do dishes. (Tr. 198). She reported that she can drive, travel alone, and shop for groceries and toiletries whenever necessary for as much time as necessary. (Tr. 199). She testified that she spends time with others on a daily basis. (Tr. 200). However, she indicated that she does not associate with friends anymore and had problems talking, with memory, completing tasks, and concentrating. (Tr. 201). She reported that she was "good" at following written instructions and "ok" at following spoken instructions. (Tr. 201). She reported that she got along with authority figures "fine" and that she had never been laid off or fired from a job because of problems getting along with other people, but indicated that she often quit because she missed too much work or had breakdowns. (Tr. 202).

She reported that she was "terrible" at handling stress. (Tr. 202).

On August 11, 2010, Dr. Paul Perch, Ed.D, completed a mental RFC form. He opined that Plaintiff had no limitation in understanding and memory, except for marked limitation in understanding and remembering detailed instructions. (Tr. 281). He opined that Plaintiff had no limitation in sustained concentration and persistence, except for marked limitations in carrying out detailed instructions. (Tr. 281). He opined that Plaintiff had no limitation in social interaction, except for a moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 282). He opined that she had no limitation in adaptation, except for a moderate limitation in the ability to respond appropriately to changes in the work setting. (Tr. 282). Overall, he opined that she had mild limitations in activities of daily living and moderate limitations in maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 294). He concluded that she was "able to meet the basic mental demands of competitive work on a sustained basis." (Tr. 283).

On October 26, 2010, Plaintiff reported to Dr. Newton that she had been doing poorly for two days and that she was "more or less paralyzed in her daily activities." (Tr. 443). She had been feeling down and agitated and could not relax. (Tr. 443). She was assessed a GAF of 50. (Tr. 443). However, she was not seen again until January 4, 2011, when she reported that she was "fairly well" and "was able to cope with the stressors" of a rough Christmas. (Tr. 442). Again, her insight and judgment were fair, and her mental status exam was otherwise entirely normal. (Tr. 442). She was assessed a GAF of 55. (Tr. 441). She was not seen again until May 17, 2011, when she reported that she had been doing well, had no complaints, and was again assessed a GAF of 55. (Tr. 441). On July 19, 2011, she again reported that she had been doing

well with no new complaints, although her insurance would no longer pay for Lexapro. (Tr. 440). Her sleep remained poor, she had dysthymic mood, and her cognition, judgment, and insight were impaired but her mental status exam was otherwise normal. (Tr. 440). She was assessed a GAF of 55. (Tr. 440). In sum, except for her initial evaluation in December of 2009, prior to the alleged onset date, and two days in October of 2010, Plaintiff's visits with Dr. Newton indicated improving or stable mood and almost entirely normal mental status exams.

Plaintiff also saw Dr. Passi between June 22, 2009 and September 16, 2011. She reported anxiety symptoms in September of 2009, prior to her evaluation with Dr. Newton and her alleged onset date, but by October 12, 2009, she reported that she was "feeling much better on the medication" with no crying episodes. (Tr. 237-39). She was seen on December 10, 2009, after falling on ice, and did not mention depression, anxiety, or other psychological symptoms. (Tr. 241-43). She was seen on March 25, 2010, and was "very anxious about having diabetes" so Dr. Passi noted "I strongly encourage her to call Dr. Newton regarding medication. I suspect most of anxiety comes from thinking that she may have diabetes." (Tr. 246). At an annual gynecological exam on June 18, 2010, Plaintiff did not mention psychological symptoms. (Tr. 247).

Plaintiff saw Dr. Passi on July 21, 2010 for impacted wisdom teeth, September 27, 2010 for leg pain, November 24, 2010 for hand numbness, December 8, 2010 for a cough, January 26, 2011 for a cough and carpal tunnel syndrome, February 9, 2011 for a yeast infection, February 23, 2011 for irritated eyes, and March 28, 2011 for a cough. (Tr. 250, 632, 635-49). She did not mention psychological symptoms at any of these visits. (Tr. 250-51, 632, 635-49).

Plaintiff also received treatment for various physical impairments from other providers. However, the ALJ determined at step two that her physical impairments were non-severe, and

therefore had only a minimal effect on her ability to engage in work activities. Plaintiff has not challenged this finding.

Plaintiff, Plaintiff's mother, and a vocational expert testified at the hearing on August 31, 2011. (Tr. 32). Plaintiff testified that she quit her job as a cashier in May of 2010 because she was having problems with depression and mania after her medication changed. (Tr. 38).  Plaintiff testified that she had "depression days," when she sometimes could not get out of bed, four or five days a week. (Tr. 39). She testified that when she has mania, one or two days a week, she cannot concentrate or handle being around a lot of people. (Tr. 39). She testified that she only saw Dr. Newton every two months, and did not see anyone for counseling in between that. (Tr. 40). She testified that stress triggers her symptoms "on occasion" and that she can't get herself motivated to do housework. (Tr. 42). She testified that she and her three year-old son mostly just watch television during the day. (Tr. 43). She testified that she has sleep problems and takes naps during the day. (Tr. 43). She testified that she had no hobbies or friends and did not exercise. (Tr. 44). She testified that she had no problems getting along with co-workers or supervisors. (Tr. 45). She testified that her biggest fear was her depression or mania causing her to walk out of a job.  (Tr. 46). She testified that Dr. Newton's notes that she was doing "okay" were not accurate because she is not good at expressing herself and does not want to upset herself. (Tr. 48). She testified that she only sees him for about ten to fifteen minutes at a time. (Tr. 48).  She testified that she had thoughts of suicide but caring for her son prevents her from hurting herself. (Tr. 49).

Plaintiff's mother testified that she was close with Plaintiff and sees her every other day. (Tr. 53). She testified that Plaintiff tells Dr. Newton she is okay even though she was not. (Tr. 54). She testified that Plaintiff struggles with anxiety and depression, and that she can "be okay

and then all of sudden, boom, just like that, she can't do things—nothing, really." (Tr. 54). She

testified that her daughter sometimes needed help twice a week, and sometimes, did not need any

help in a week. (Tr. 56). She testified that Plaintiff quit her job as a cashier after repeatedly

calling off. (Tr. 57). The vocational expert testified that, given the RFC described below,

Plaintiff could perform her past relevant work as a hospital housekeeper. (Tr. 64).

At step one, the ALJ found that Plaintiff was insured through September 30, 2012, and

has not engaged in substantial gainful activity since May 22, 2010, the alleged onset date. (Tr.

16). At step two, the ALJ found that Plaintiff's physical impairments were non-severe, but that

her bipolar disorder, generalized anxiety disorder, and personality disorder were severe. (Tr. 16).

At step three, the ALJ found that none of Plaintiff's impairments, alone or in combination, met

or equaled a listing. (Tr. 17-18). The ALJ found that Plaintiff had the RFC to perform a full

range of work at all exertional levels but limited to simple routine tasks, low stress work

environment defined as occasional decision making and occasional changes in work setting, no

direct interaction with the public but rather working with things rather than people, and

occasional interaction with co-workers and supervisors. (Tr. 18). The ALJ further found that she

could complete job duties by the end of a work day but could not work in fast paced production

work, such as conveyor belt work. (Tr. 18). At step four, the ALJ found that Plaintiff had the

RFC to perform her past relevant work as a hospital housekeeper. (Tr. 22). Consequently, the

ALJ found that Plaintiff was not disabled within the meaning of the Act and not entitled to

benefits. (Tr. 24).

## VI.     Plaintiff Allegations of Error

### A.      The ALJ's assignment of weight to the opinion evidence

Plaintiff asserts that the ALJ failed to "give adequate rationale for rejecting the treating and examining source opinions and…failed to give proper consideration to treating and examining physicians." (Pl. Brief at 2). She cites Dr. Newton's diagnoses and his notes prior to the alleged onset date that Plaintiff was symptomatic. (Pl. Brief at 3). However, she does not identify any opinion by Dr. Newton or any treatment notes during the relevant period. Similarly, she cites to Dr. Passi's diagnoses and observations that she had "chest heaviness and shortness of breath," but does not identify any opinion by Dr. Passi. (Pl. Brief at 4). She does not identify any functional limitations during the relevant period noted by either doctor. (Pl. Brief at 3-4). In fact, Dr. Passi opined during this period that Plaintiff's symptoms did not render her unable to work.

Plaintiff asserts that Dr. Perch's assessment of marked limitations in understanding, remembering, and carrying out tasks was "not given significant weight by the Administrative Law Judge." (Pl. Brief at 4). However, the ALJ credited this opinion and limited Plaintiff to simple and routine tasks.

Plaintiff asserts that her hospitalizations from 1997, 1999, and 2001 "show a pattern of decomposition and longstanding, ongoing mental illness and should have been given more consideration by the Administrative Law Judge." (Tr. 4). However, Plaintiff identifies no additional functional limitation these records show. Moreover, the ALJ specifically found that:

> The undersigned finds no basis upon which to reopen the decisions on the claimant's prior applications (20 CFR 404.988, *et seq.*). Additionally, the provisions of Social Security Ruling 91-5p were considered and do not apply. Any reference herein to those prior decisions or the medical and opinion evidence upon which they were based is for clarification and background purposes only and not intended to reopen or revise any prior decision.

(Tr. 14). Consequently, res judicata bars the Court from exercising jurisdiction to evaluate whether the records prior to June 22, 2009 establish disability prior to that time. Tobak v. Apfel,

195 F.3d 183, 185-88 (3d Cir. 1999); <u>Rogerson v. Sec'y of Health & Human Servs.</u>, 872 F.2d 24, 29 n.5  (3d Cir. 1989).

However, Defendant incorrectly asserts that these records are entirely irrelevant to the current claim. Instead, these records may be considered for the limited purpose of determining whether Plaintiff was disabled during the relevant period for the present application. For instance, such records may be relevant where there is a progressive worsening of a claimant's condition:

> [A]lthough the final judgment denying that application was res judicata, this did not render evidence submitted in support of the application inadmissible to establish, though only in combination with later evidence, that she had become disabled after the period covered by the first proceeding. Res judicata bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994. *Rucker v. Chater*, 92 F.3d 492, 495 (7th Cir.1996); *Purter v. Heckler*, 771 F.2d 682, 690–91 (3d Cir.1985); cf. *Peabody Coal Co. v. Spese*, 117 F.3d 1001, 1007–08 (7th Cir.1997) (en banc). What is true is that under the collateral estoppel branch of res judicata, the judgment denying the earlier claim may bar the relitigation of issues essential to the second claim as well. But it need not, especially when the disabling condition is progressive; for in that event there is no necessary inconsistency in finding an applicant not disabled at time *t* but disabled at *t*+1. There thus is no absolute bar to the admission in the second proceeding of evidence that had been introduced in the prior proceeding yet had not persuaded the agency to award benefits. The "readmission" of that evidence is barred only if a finding entitled to collateral estoppel effect establishes that the evidence provides no support for the current claim. *Robbins v. HHS*, 895 F.2d 1223, 1224 (8th Cir.1990) (per curiam). That would be true if the earlier evidence had been found unworthy of belief. This is not what happened here. The earlier evidence just wasn't strong enough *by itself* to establish disability. It still might reinforce or illuminate or fill gaps in the evidence developed for the second proceeding. *Robertson v. Sullivan*, 979 F.2d 623, 625 (8th Cir.1992) (per curiam); *Frustaglia v. HHS*, 829 F.2d 192, 193 (1st Cir.1987) (per curiam).

<u>Groves v. Apfel</u>, 148 F.3d 809, 810-11 (7th Cir. 1998); <u>Rodriguez v. Comm'r of Soc. Sec.</u>, CIV.A. 09-190 NLH, 2011 WL 4593740 at *5 (D.N.J. Sept. 30, 2011)( "While there is a 'fine line' between 'considering a claimant's medical history solely for the purpose of establishing whether the claimant was disabled' and 'actually reconsidering that evidence,' it appears that the

ALJ here considered records predating the 2004 application solely to determine whether Plaintiff was disabled as of the onset date set forth in such application. Accordingly, the fact that the ALJ reviewed medical records that may have also been submitted in connection with Plaintiff's 2001 application does not mandate a finding that the ALJ constructively reopened the 2001 claim.") (quoting Kaszer v. Massanari, 40 F. App'x 686, 694-95 (3d Cir. 2002)).

Here, the ALJ properly considered these records solely for the purpose of determining whether Plaintiff was disabled during the relevant period. Unlike the hypothetical in Groves, the Plaintiff in this case had improved, rather than worsened, since the previous records. As discussed above, Plaintiff's mood was generally stable during the relevant period, she was only treated by a psychiatrist six times during the relevant period and nine times total, generally every two months, for ten to fifteen minutes, and there was no indication she continued to struggle with substance abuse or self-injurious behavior. She indicated suicidal ideations on April 21, 2010, but never during the relevant period.

In contrast, her hospitalizations in 1997, 1998, and 2001 indicated alcohol dependence, self-injurious behavior, suicide ideation, and a trazodone overdose. (Tr. 298-300, 305, 310, 313, 323). After being prescribed Lexapro, she did well through 2004 and 2005. (Tr. 365, 367). By March 2, 2006, she had worsening anxiety and had suicide ideations and "continue[d]…symptoms of bipolar disorder including rapid fluctuations in mood" through May of 2007. (Tr. 343). However, by October 9, 2007 her symptoms were "well-maintained on current medications" and she was "currently without complaints." (Tr. 339).

On January 15, 2008, April 15, 2008, and April 30, 2008, she reported to Dr. Passi that her depression and anxiety were well-controlled on her medication. (Tr. 223, 225 394). Although

Plaintiff wanted disability forms filled out, she refused to schedule a psychiatry examination . (Tr. 229-31, 235). Dr. Passi noted "She needs to see psychiatry for an evaluation. I will extend her temp disability one more time for her, but will not do again unless she gets an appt with them. She does not appear to me during this interview to have [symptoms] that would keep her from working." (Tr. 236). These records demonstrate that Plaintiff had severe problems with substances, self-injurious behavior, and suicide ideation up until October of 2007, when she found a medication regimen that worked for her. As discussed above, she was not treated by a mental health specialist again until December of 2009, and from December of 2009 through the date of the ALJ decision, received only conservative treatment with generally stable mood.

These records are relevant to the applicable period for the present application only for the purpose of demonstrating that Plaintiff's impairments have improved and stabilized. The ALJ correctly used these records only to establish this improvement. The ALJ was not permitted to, as the Plaintiff argues, give them "more consideration" because they show a "pattern of decompensation and longstanding, ongoing mental illness." (Pl. Brief at 4). Moreover, the prior denials of benefits, which included Plaintiff's inpatient hospitalizations and more severe symptoms in the relevant period, provide more support for the ALJ's present denial of benefits, where there had been no inpatient or extensive outpatient treatment during the relevant period.

Finally, Plaintiff cites to mental health diagnoses, an amputation of two toes, mild degenerative changes to her knee, and carpal tunnel surgery. (Pl. Brief at 5). She does not explain how these citations advance her argument and thus waives consideration of these issues. Conroy v. Leone, 316 F. App'x 140, 144 n. 5 (3d Cir. 2009) (citing Bagot v. Ashcroft, 398 F.3d 252, 256 (3d Cir.2005). Consequently, the Court concludes that substantial evidence supports the weight

assigned by the ALJ to the medical opinions and evidence.

**B.       The ALJ's credibility determination**

Plaintiff also argues that the ALJ improperly evaluated the credibility of her claims and testimony. Plaintiff does not develop this argument, and merely summarizes her testimony. As discussed above, this would allow the Court to conclude that this argument had been waived. However, even if it had not been waived, Plaintiff would have been unable to show that the ALJ's credibility assessment lacked substantial evidence.

When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; See also 20 C.F.R. § 416.929. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7P. Additionally, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." Id.

The ALJ found that Plaintiff was not fully credible because her claims contradicted the mental health treatment record during the relevant period. As discussed above, Plaintiff received

only very conservative treatment and generally reported that her mood was stable with normal mental status exams. This was a proper basis to reject her credibility. SSR 96-7p. Plaintiff asserted at the hearing that Dr. Newton's treatment notes were not accurate because she was not good at expressing herself to him. However, the role of the Court is not to reweigh evidence. Instead, the Court limited to only evaluating whether the ALJ's credibility determination is supported by substantial evidence. The ALJ was in a much better position than this Court to evaluate this assertion by Plaintiff. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (Courts will "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.").

There was also no indication anywhere in the medical record that Plaintiff was not forthcoming with her physicians. She consistently and voluntarily reported symptoms of anxiety and depression prior to the relevant period, including substance abuse, suicide ideation, and self-injurious behavior. Plaintiff has not provided any explanation for her apparent willingness to be forthcoming with physicians before the onset date in comparison to her claimed unwillingness to be forthcoming with physicians after the onset date. Moreover, Dr. Newton's observations of improvement were not based only on Plaintiff's subjective reports. He also observed that she "looked much better," (Tr. 217) and that her attention, concentration, insight, and judgment had improved. (Tr. 217, 441-42, 444).

The ALJ also cited Plaintiff's refusal to follow Dr. Possi's orders to schedule a psychological evaluation until December 2009. (Tr. 22). The Court notes that Plaintiff also refused to schedule one-on-one counseling in between her visits every two months with Dr. Newton, and had a long history of noncompliance with psychotropic medication. Lack of

treatment and failure to follow treatment recommendations can support an adverse credibility finding. SSR 96-7p. Consequently, the Court concludes that substantial evidence supports the credibility assessment.

## VIII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.

Dated: September 8, 2014                                      s/Gerald B. Cohn

                                                             GERALD B. COHN
                                                             UNITED STATES MAGISTRATE JUDGE